May it please the court. My name is Scott Blankenship. I'm here on behalf of Behrouz Shokri. I'd like to reserve five minutes for rebuttal. This is not a case where you have a poor performer or even a decline in performance. This is a case about an employee that spent 29 years at Boeing, made substantial cost savings and did an excellent and superior job. Counsel, you have record to support everything that you just said. I understand that. But as I understand the law, it would be just fine and nothing to take to court for Boeing to fire Shokri as a pure stupid mistake. A great employee and they fire him. Just it's just a stupid mistake or a nasty supervisor or something. The only thing they can't fire him for is discrimination on the basis of race, nationality and so forth. And my difficulty with your case on that is you've got two things that suggest that they did fire him because of rate or riff him because of race and nationality. One is Garrity saying, where are you from? And the other is Garrity saying at the same time and something else that could be taken as referring to his nationality. But I didn't see where you had anything else. And I was kind of struck that Garrity didn't fire Shokri's wife or his brother, even though they're just as Iranian as he is. Well, Your Honor, there's a to answer the first question. There is ample evidence of a pattern of hostility, even mendacity and lying that the pretext is unworthy of credence here. But with respect to the other Shokris, John Garrity never supervised his brother or his wife during the time period of the riff. So it's it's plainly irrelevant. Didn't Garrity have authority to riff one of the two of them? I can't remember whether it was later or the brother. No, absolutely not. That's a false. That's a lie. He did not. Mr. Cyrus Shokri was not under the supervision and Fariba Shokri was under Marcy McKeown's supervision. So that's a false. I mean, this may be outside the record, but I thought at a later time you're arguing during this time. And that's right. But two or three years after, wasn't the brother supervised by Garrity? He was supervised later. And this is outside the record. But he testified that Garrity discriminated against him. But that's not at issue here. We're talking about a riff that occurred when the defendant misrepresents that the Shokris were somehow under Garrity's supervision. That's evidence of mendacity and pretext, if you ask me. What we have here is almost an exact cause and effect. We this is we have a case where Mr. Garrity doesn't remember what was said in that conversation, but in a dispute about... I don't remember it being that simple. I mean, it looks like Shokri just met Garrity once. Garrity was supervising him from, I think it was South Carolina or North Carolina. And they just met in person once. And on that one first meeting, Shokri picks a fight with him and tells him all the lousy supervision and training and credit that he's rendering, basically just bites it off with his new boss, which is an alternative theory for why his boss didn't like him much. That's way in the evidence, though, because the only person who recalls that testimony is Mr. Shokri. And Mr. Shokri, it demonstrates two things. One, he wasn't competent to do the performance review in the first place. He didn't have knowledge, he didn't have any background. But moreover, it's what is your nationality? Where are you from? And then Mr. Shokri responds, I'm from Iran. What does that have to do with things? And then he says, do you have any other complaints? That's the record and the light most favorable to the jury. But Mr. Shokri also says that that conversation was about Mr. Shokri being upset that they're not going to have weekly meetings or bi-weekly meetings or something. I mean, he's definitely complaining about something. Right. It's just like if somebody cuts you off and they're black and you use the N-word because you're frustrated, that's what this is. This is picking the greatest weakness they could see in Mr. Shokri. They had a disagreement, he went racial. And that's acceptable. Then five days after that. So I have a question about as far as I can tell, in the ADR complaint that Mr. Shokri brought, he doesn't say anything about discrimination. Is that right? That's not right. Okay. Where is it in the record? Does he say that it's about discrimination? Well, there's there's admissions in the record of him complaining about discrimination to John Garrity. If you look at the ADR complaints, the later on ADR complaints, you will see... You mean the EEO ones? The EEO ones. Okay. So I'm trying to distinguish. There's ADR and there's EEO, as I understand it. I don't see anything about discrimination in the ADR complaint. Well, there is some discrimination where he references in the ADR complaint, but he was told to take it out. You cannot pursue ADR and EEO at the same place. And that's why he got the runaround. But wasn't that later, like in a conversation in February or something where he was told that? I mean, do we have documentation that in December, I think it was in December when he filed the first paperwork that he tried to include something about this where are you from statement? We have. We have something later in the EEO, but we do have a conversation with John Garrity, which is undisputed, where he says the way you graded me was biased and discriminatory. Right. That's in January. So I want to really differentiate between the RIF and the performance management plan. Mr. Shoukri, if he'd been rated like he had in the management plan, which John Garrity did not have the foundation or the competency to even give. But then once you get in the RIF, that's where we've got the evidence of pretext where. And this is the lowering of the one score, the adaptability score. Is that the evidence of pretext? More than just that. But that's that's where he's basically not advocating for Mr. Shoukri. Instead, he's trying to get Mr. Shoukri. You know, what kept coming to mind is I read your brief on this. We have discussions with law professors all the time about prospective law clerks, law clerk applicants, and professors are always complaining to me. I can't give somebody an A minus without giving somebody else a flat B because of the curve. And so they change grades downwards so that they can give somebody else a high grade. Why isn't this just like that? I didn't understand the racial aspect. Well, it's the retaliatory aspect, which you can look at as racial aspect. But you've got basically John Geary, who's not. You're saying to reduce his grade suggests some kind of discrimination. Or animus. And I don't see how to distinguish it from those law professors telling me they had to reduce somebody's grade to give my applicant an A minus or an A. And that's why it's a big deal. Well, that would be manipulating a system that's supposed to be objective. Each of the managers are going to want to keep their people. A sense of a firm curve, a rigid curve that the school imposed. Well, there's absolutely no evidence contemporaneous similar to McGill. Well, that's in the job in the job review in I think it's December, but it might have been late November. It actually says I'm lowering your grades because of the curve. And don't take it as a as a sign that I think your performance got weaker. It says that it's contemporaneous. It's in the review itself. That's nothing. There's no directive from HR or anything that says that. Why would Gary write that if it's not true that it's a company policy? Wouldn't someone read it and say, what are you talking about? Why would you write that? I mean, because at that point, Gary had at that point, Mr. Shoukri had basically challenged him. No, no, he had. Well, maybe in the moment he said, I don't think that's relevant to the conversation. But the January conversation happens after the job review that says this thing about the company policy. No, but but if you look at the progression, your honor, you basically have the meeting with Mr. Shoukri, where he attacks his. What's your nationality? Where are you from? And it was October. And then five days later, the lean plus that that that was the cost savings. Gary lies to Marcy McCune four months later and said that he never submitted it. And then we go from there to to November 24th or so. November 25th, it seems like is the year end performance, which simultaneously says this thing about the curve. But it's only 40 percent of the review. There's testimony from Tim Nelson that says I didn't give feedback to Gary about the riff, which is 60 percent. And the reason I didn't is that's not what you do. We've got this narrative. OK, let's go to the riff then. So now we're jumping to later, like February. And in in that riff. So it seems like you're saying our evidence of pretext is that Gary lowered the score from three to two on adaptability. That's your evidence. More than that. OK, what is the more than that? Because what I don't understand is if he was going to go in trying to get this guy fired, why didn't he just lower the scores more in the first place? Why do we wait for the meeting, the consensus meeting with the other managers where he lowers only one score? Why would that be? I don't understand. Because there's a riff node. He basically, Mr. Shoker was the only person that went from two fours to two threes. If he had one four and one three, he wouldn't even been in the riff node. But the riff node was when he was looking at the scores with Marcy McEwen and realizing that Beru Shokri still survived the riff. And that is on 637. And if you look, you can see that basically, Gary only had two people that were at risk for the riff. Then he talks to Marcy McEwen. And if he wanted to get Shokri fired, he would have given him lower scores before that meeting. I don't understand the theory of how you think Gary was behaving. Because if he's trying to get back at Shokri, he just gives him lower scores before he even has to defend it to the other managers. Well, you have to hide and cleanse that a little bit. He's complained probably three or four times before that they've even, that he's having the meeting with Marcy McEwen. And then he continues to disparage everybody who's trying to support Mr. Shokri. There's more here than just a riff. There's denial of his raise. There's basically, he starts his ADR prior to the riff. And they don't even allow it to finish. That's absurd. I mean, there's all these things. Boeing doesn't do any investigation. He complains 13 times. I can't find a case, Your Honor, that has anything close to this. I mean, if you look at McGinst, this circuit overturned based on the fact there was no contemporaneous document for a hiring freeze. You look at the layoff cases, and this is so much more extreme than the situations with respect to the layoff cases. And you look at Pollard v. Chertoff, we've got somebody, this riff is not a neutral process. Neither is the ADR. We have, if you even assume that the riff is a neutral process, then we have a biased subordinate here that's affecting the outcome. You've got Pollard v. Chertoff where it's overturned for that reason alone. We also have no issues of performance with this person. It's just- They have to riff somebody if they're shrinking the one office and enlarging another. Why riff the guy that saved the company $10 million? That's so disputed. Well, we don't know what the other employees saved the company. Well, what we do know is what's in the record. And Tim Nelson said he couldn't think of anyone else who would save the company that money. It's not that most favorable to Boeing if you conclude that the other people did when Boeing provided no evidence of anyone else. And we have very- This is not a case where we're relying on Mr. Shoukri's declaration. We've got Kathy Masonette, who was an engineer person who did the numbers showing this cost savings. You've got Mike Wilmore. You've got John McLeese saying he's a leader. If you look at ER-419 and you look at what the assessment rating scale is, there's no way that you can see that Mr. Shoukri should get a basic, which is can demonstrate and perform competency independently but may require assistance. This sounds to me more like a jury argument. I mean- It is, and it should be. Should be. But always, companies have people in place with supervisory authority who do a bad job. And the civil rights provisions have nothing to say to that. I agree. Where's the bad job? They offer no specific evidence here. Let's accept your whole jury argument. Putting Garrity, a man who doesn't know what he's doing as far as supervising and rating people in charge of supervising and rating this department, having him do it with a free hand even though he hardly ever goes there, and not appreciating just what a valuable employee Shoukri is, all that stuff, company can make a fool of itself and it's fine. The only thing that is not fine is if they're doing it on a racial basis. Or they're basically taking no measures to investigate, which is what Boeing did time and time again. They acknowledged repeatedly on the record that he complained about EEO or discrimination retaliation. Didn't even interview him. I mean, at what point can you do what the Court referred to in one of these cases? I think it was against- You can run your company badly in every possible way, including not investigating complaints properly. I don't understand why that shows racial animus. Nor should have known. I mean, he was being retaliated against. People like McLeese, the senior IT person was called not smart when he wanted to extend his riff. Mr. Shoukri had 545 hours. People were actually in complete panic that he was so necessary for the job that you've got letters and letters going out trying to keep him. And what do you have Mr. Geraghty doing with no foundation whatsoever? Doing the kind of stuff like he did with McCune, where he didn't even know what Shoukri did and had to do it in a mail message to even know if he was an analyst or a programmer. This case has so much mendacity. It's so not worthy of credence here. Let me ask you a question. All right. So we know the District Court said you put a prima facie case on that under McDonnell Douglas. They came back, right? And then you came back. And one of the things you came back with to show that this wasn't just some off-the-cuff jerk. Okay. I'm not saying Mr. Geraghty's a jerk, by the way. I'm just saying that picking up from where Judge Kleinfeld has stated what is an absolutely correct proposition of the law, undisputed, that you can be a jerk, but you don't necessarily violate the anti-discrimination provisions. You could do something for wholly unprofessional, unjustified reasons, as long as they aren't one of the reasons covered by the Act. It isn't discrimination. Now, you say you have these IM messages that prove that this was discrimination. What were these messages? Well, it's basically the messages that show that Geraghty, a manager, typically would want to keep their employees. Instead, he's sabotaging the employees. And we provided exhibits that show that there were only two people at risk. It wasn't Mr. Shoukri. Why do we have to assume that a manager would always want to protect their employees? Maybe a manager in this situation needs to find people the company can lay off because that's the company's goal. It's because the reasonable inference in this case where somebody complains about discrimination with Judge Jones' greed was a reasonable belief would be to look at the adverse actions that follow and look at the mendacity and the behavior and say, in Boeing, basically not investigating this guy. Unlike the cases like the Toshiba case, HR actually got in and investigated. They did nothing. In fact, what they were trying to do is basically have him sign a release and take six months pay. That was their idea of how to deal with the discrimination, not investigate it, force him into a situation, disappoint all the high-level managers wanting to keep him, and have him sign a release. And when he didn't, they acknowledged in writing that there was going to be a lawsuit. This is a very strong retaliation case, much stronger than the cases that the courts reversed in the past. We've taken you over your time. We'll give you a minute for rebuttal. Thank you, Your Honor. Good morning. May it please the Court. My name is Matt Charbaugh. I represent the Boeing Company in this appeal. Your Honor, the district court in this case rightly held on a fully developed record at summary judgment that appellant failed to satisfy his burden to show that he was the intentional discrimination based on his race or national origin or retaliation. After all, that's what this case is about. Let me focus on what, to me anyway, is what's of the greatest concern with your argument. You've got these two remarks when Shokri makes Garrity mad. Garrity says, where are you from and what is your nationality? Why isn't that enough to put at issue whether Garrity's getting Shokri riffed is based on Shokri's nationality? So we addressed this issue in the brief, Judge Kleinfeld, but to answer your question here today, absolutely. So those statements on their face, appellant tries to turn them into direct evidence of discrimination. They're certainly not that. And that argument was forfeited below. Why aren't they? Because when you heard that hypothetical case of the bad driver that your adversary posed, why aren't they evidence of discriminatory motive? In that hypothetical, Your Honor, there was a racial epithet that was directly directed at an individual. Here, we have questions that are posed to Mr. Shokri. Where are you from? Or you're saying a question is different from an epithet. Do you have anything better than that? Not necessarily, Judge Kleinfeld. It's not simply that it's a question. But even Chief Judge Martinez below says I'm going to discriminate against you because you're Zoroastrian and I hate Zoroastrians. That's evidence. But if he says, are you Zoroastrian? That's not. Is that what you're telling me? It could be, Judge Kleinfeld. Certainly, the hypothetical you gave is direct evidence of discrimination. I am going to discriminate against you because you're Zoroastrian. That's not what the issue was here. Juries are allowed to draw inferences. They're not limited to direct evidence. In fact, one of the boilerplate instructions that we give juries is you're allowed to consider inferences from the evidence. And circumstantial evidence can be just as probative as direct evidence. You're right, Judge Kleinfeld. But this Court has also said that where a plaintiff attempts to establish pretext by circumstantial evidence, they have to come forward with specific and substantial evidence. Those two remarks are it. Why aren't they? We disagree that that's the case, Judge Kleinfeld. I don't know if we disagree. You don't know my views yet. I'm trying to find out what your views are because aside from telling me unless it has a question mark at the end of it, it's not evidence of a discriminatory motive, that strikes me as a weak argument. If you have other arguments for why those two remarks are not evidence from which a jury could infer discriminatory motive, tell me. To be fair, Judge Kleinfeld, I'm not simply saying that it's the fact that it's a question. OK? It's in order to get to the point that those remarks are discriminatory, you need an inference. Therefore, it's not direct evidence of discrimination. And this Court held in the Rashton case, which we cited in our briefs, that a supervisor's question to a dental student about where are you from in referring to a procedure as third world dentistry. Well, there are questions and questions. Rashton is your best case. But there are questions and then there are questions. For example, if two people are eating lunch together and they don't have any adversity in their relationship at all and one of them has a foreign accent, so the other one says, oh, where are you from? I'm from, I don't know, Spain or Tobago. Oh, that's nice. Tell me about Spain or Tobago or wherever it is. There's no evidence there of any discriminatory motive. But in other circumstances, there may be. Back in the 60s, if you were going into a store in maybe a little town in Alabama and you spoke with a New York accent, where are you from might very well be evidence of a discriminatory motive. So I don't know whether to follow and extend Rashton or limit and distinguish Rashton. I think the best you can say for repellent's position here would be what Chief Judge Martinez said below, that the question itself isn't discrimination. It's conceivable that construing every inference in Mr. Shoukri's favor, that the circumstances he describes surrounding it might allow a jury to weakly infer an inference of discrimination. Chief Judge Martinez called that a scintilla of evidence. You know, excuse me, I'm having exactly the same problem that Judge Kleinfeld is having here, but maybe for a different reason. You have a situation here where I would say that your case would be substantially better in substantially better if these two remarks had not been made. And if the two remarks have been made and very little else occurred, your case would be much better. My concern is this, and I've heard this described in this way, you got these two remarks, okay, so we have two seeds put in the ground, and then you have Garrity doing a whole host of other things that were negative with respect to Mr. Shoukri. Now, in and of themselves, these things might be just because he's an incompetent manager if he is, or he just doesn't like the guy for whatever reason. But when you take these two seeds and you keep putting water on them with every single one of these instances where he has taken what appears to be in some instances, at least to me, somewhat pointed action against the man for reasons that could be suggested by a jury to be related to the seed that was planted by Garrity way back when, then don't you have a jury question? No, Judge. Why? Why? Because in asking appellant's counsel what else they had to offer, what did we hear? We heard that Mr. Garrity was a bad manager. The law doesn't protect that, and that would apply just the same to everyone else who was evaluated him. I don't think they said Mr. Garrity was just a bad manager. They said that Mr. Garrity did everything in his power to torpedo Mr. Shoukri by putting him in the position of downgrading him, which I agree. I'm telling you, I think that these things taken in isolation might be absolutely innocent. But when you have something as pointed as making a... Now, agreed, Mr. Shoukri may not have been the model of deportment in his first meeting with Mr. Garrity. Let's assume that he overreacted or suggested things or made Garrity mad. But nonetheless, Mr. Garrity comes back and makes what are at least one totally unacceptable comment by asking somebody what's his nationality. What does that have to do with the conversation? And where are you from? What does that have to do with it? It has nothing to do with it. Shoukri was exactly correct in that respect. It had nothing to do with it. We're not talking about his nationality having anything to do with that meeting. And then he subsequently takes a number of actions, which Boeing really has nothing in itself. Boeing itself has nothing to do with it. It's all Garrity doing this stuff, kind of unsupervised. He's kind of like out of the wild west here doing whatever he wants to do. And he's in these meetings and he's downgrading Shoukri and he's sending IMs back and forth, which indicate that possibly Shoukri is not as good as suggested. As I said, in and of themselves, probably not actionable. But when you add the rather unfortunate comments made by Mr. Garrity, to say the least, at the beginning of their relationship, I'm just having a hard time under Ninth Circuit law, at least, figuring out why this isn't a jury trial. So to answer your question, judges, first of all, Boeing disputes that Mr. Garrity made the comments that are alleged certainly in the context. We're here on summary judgment, so we're not going to get into that. But I understand. I just want to make that clear for the record. But in any event, the subsequent issues in terms of Mr. Garrity being off the reservation, so to speak, that's just not borne out by the record. What you have here, first of all, he evaluated him in his performance management review, the PM review. I'm taking Mr. Garrity's position, OK? Because that's what we have to do, don't we? Mr. Shoukri's position. I'm taking Mr. Shoukri's position. I think you're part of it. I'm not saying you should find otherwise. Mr. Shoukri. I just want to put that on the record so that it's clear. I'm not saying you should find otherwise. We're just injecting some irrelevant stuff just to make Boeing look better. With respect, no, Judge Kleinfeld, I'm just trying to make sure that the record's clear. What matters to me here is Rashtan. And Rashtan has this language here. To be sure, the Third World reference was an offensive, insensitive, and politically incorrect jab. It was directed, however, at the procedure, not Rashtan's national origin. The procedure was Rashtan messed up on a cap, or was it a reconstruction? Failed crown setting. That's it. Failed crown setting. And they gave her some remedial dentistry work, and she didn't do any better. So it looks like what the opinion is doing there is saying that despite the offensive reference to Rashtan doing Third World dentistry and asking where are you from, nevertheless, that's not why they flunked her. The reason they flunked her is she was a bad dentist and was harming patients. The question for me is, does Rashtan mean where are you from was okay in Rashtan, so it's okay here? Or should Rashtan be distinguished? Our position is that Rashtan applies here. And at first, the court does mention that it was a comment in reference to the procedure. The court then goes on to say that a different supervisor referred to the plaintiff directly as TW, which is short for Third World. So we think that applies. I do want to get back to Judge Edgeworth's question in terms of these other follow-up issues by Mr. Garrity. And as Judge Friedland pointed out in the performance review, the scores were lowered not because Mr. Shokri did a worse job, but because Boeing, and this is undisputed, was asking its managers to force greater differentiation among its employees. That's in the review itself. Other managers testified to that in the record below. That's in our brief. At that time, there is no evidence that Mr. Garrity was aware that there would be a reduction in force coming down the line. So the idea that he did that in order to set him up for a layoff is not supported by the record. There's no evidence of it. No, I'm talking about things he did during the process. And turning to that then, Judge Edgeworth, you get to the reduction in force process. Mr. Garrity prepares the scores independently at first. And if you look at the actual competency scores, he gives Mr. Shokri credit in a lot of respects. He has two fours for customer service and adaptability, which are the points that Mr. Shokri likes to be proud of, and rightfully so. But Mr. Garrity recognized that in the scores. He also scored him at a three originally, and it was only during the consensus meeting when he needed the approval and input of all the managers there that that was reclassified to a two. And other employees in that same RIF group, by the way, had their scores altered at that stage in the process. So to suggest that he scored him in these competencies to torpedo him, the record just does not bear that out. Mr. Garrity had no idea what the other managers were going to be scoring their people at that time. And if you look at the threes and fours that he gave to Mr. Shokri, those just aren't the sorts of scores where you could say, I'm going to score this guy this way so that he gets laid off. And they're consistent with what he gave at the end of November before he knew about the RIF. That's exactly right, Judge Friedland. Again, we dispute that the comment carries and does the work that they suggest that it does. But even if you take that, it's a scintilla of evidence. And a reasonable jury would have to look at the record as a whole. And the other points that have been brought up don't show any sort of discriminatory or retaliatory motive. And on top of that, the jury would also have to look at the other undisputed facts in the record that negate a finding of discrimination. So this was a department-wide reduction in force, impacted the whole IT group. It was the latest in a series of reductions in force. So everybody that's left is talented. We'd already kept the freshman team. We'd already kept the JV team. This is the varsity, the starters. And so it's not surprising that Mr. Shokri has accomplishments he can point to. So did everybody else. I'm not suggesting for a moment that he has a hugely strong case. I mean, this isn't as strong a case as some cases I've seen. But let me put it this way. I mean, it's hard to say there's just a scintilla of evidence where you have a very subjective process going on. Mr. Garrity is the guy who is the supervisor. So he's going to be listened to, I would think, in these meetings. Very different than the case that Rushdown case that Judge Kleinfeld was pointing out, that you've got a dentist who just can't do the work. And everybody agrees she can't do the work. And she's given another chance to do the work. And she can't do the work. Nobody's suggesting Mr. Shokri can't do the work. What they're suggesting is he can't do the work as well as other people, based on our subjective evidence. Much of the input coming from Mr. Garrity, who has said these very discriminatory things about Mr. Shokri. And there's other things along the way. As I said, if you take them all in isolation, then you have a picture you can paint. But if you take the whole picture and look at it, I'm just wondering whether there isn't more than a mere scintilla. And under Ninth Circuit law, you don't have to give this man a jury trial. But if you take the whole record as a whole, which is what you're required to do, and you look again at the evidence that refutes any notion of discrimination here, this is Reeves versus Sanderson from the Supreme Court. Aren't we making credibility determinations then? No, Judge Ezra, because the record's undisputed on these points. And in particular part, you have, again, a reduction in force that impacted all of the Bama 4s, which was Mr. Shokri's position. Of the five Bama 4s who Mr. Garrity supervised, four of them were identified as at risk for a layoff. One ultimately took a voluntary layoff. But 80% of Mr. Garrity's Bama 4s were eliminated here. But all these other people who are getting, you know... I was at the University of Virginia JAG school, and I walked over once and saw, and I taught law school for 35 years, 34 years. And I walked over their grades, and all their grades were like really high. I mean, I just couldn't believe it. I mean, everybody was getting A's, and there was a B. Okay, so looked in isolation, you know, if a professor theoretically had said something discriminatory about a particular student, and had done some other things along the way that indicated a dislike for that student, and then gave him a B, you could take it in isolation and say, gee, a B, that's a pretty good grade. But when you look at everybody else's A's, maybe not so. That's not the record here, even at the RIF competency stage. Where did he fall in the total? Overall, he fell 22 out of 24. That's pretty bad. However, of Mr. Garrity's folks, he wasn't the last one. He had fours in two categories that no one else who was laid off got. So it's just not quite that clear cut. And when you look at the evidence in totality as a reasonable jury must as you must, there's just no basis to conclude that there was intentional discrimination or retaliation here. I see my time's up, and I'm over my time. I do want to make one quick correction for the record that you asked about, Judge Friedland. Mr. Shoker's brother, Cyrus, did subsequently report to Mr. Garrity. He did testify that he was evaluated as part of a reduction in force under Mr. Garrity and kept his job. That's S.E.R. 115. Thank you. Thank you. We ask that the Court affirm the judgment of the District Court. Thank you, Counsel. We'll give you a minute for rebuttal. This Court is correct that under on-call discrimination, you've got to look at the constellation of circumstances. Under basically White v. Burlington, you have to look at context matters. But here, if we look at the Ninth Circuit case law that is similar, like Davis, the reason that Davis got overturned, because there was nothing in the record showing why she was laid off. And it's very similar here where, and that was a case where HR was actually looking. And they basically said if you don't allow them to come up with some specific reasons for that person suffering the layoff, then any employer with, quote-unquote, the slightest guile could lay off an employee. That's what we have here. He's well. He's great. He's an A-plus. Everybody's an A-plus. He just didn't make it this time. Moreover, if you look at Wintour v. Toshiba, basically, same thing. You've got HR doing their job unlike Boeing that did nothing. And they said that HR, when they investigated, because they put the RIF on hold, that they considered only the RIF and ignored evidence of retaliatory motive from the reviews. Here we've got Boeing doing absolutely nothing. The other thing that I want to clarify from the record is that if you look at that IM between McCune and Mr. Shokri, what you'll see is that Shokri was tied with his wife, who had a 67. And we presented this in the brief. 67 would have been a passing grade. He got downgraded twice. And if you look at the exhibits, you'll see that there were only two people, and it wasn't Mr. Shokri, and it was two other people, Padgett and Johnson, that were at the bottom of the pile. And then he basically worked with McCune, who then got two employees to come up. And so effectively, you've got them engaging in a process that isn't proper, but a manipulation by Garrity, where he's lying about Shokri, lying about his accomplishments, disparaging MacLeese, even the senior IT manager of Prince. This guy's really got a bone to pick with Mr. Shokri. Now, that's something a jury should decide. But the only question is why he has a bone to pick with Shokri, not whether. One reason whether he has a bone with Shokri is Shokri picked a fight with him at their first meeting. But that's the only context. The question is whether he had a bone to pick with Shokri because of that, or whether he had a bone to pick with Shokri because he doesn't like Iranians. And that's a question for the jury. It really is. But what we do have is a pattern of retaliation that begins where he fails to submit the cost savings on November 5th, and you've got the performance management review. Wait, how is it retaliation on November 5th? What was the protected activity before November 5th? It was the meeting on October 30th, where he says, you know, where basically Shokri says, why are you asking me that? That has nothing to do with our conversation in response to where you're from. So you think that is protected activity itself? Absolutely. In fact, Garrity says, and this is the undisputed facts, that give me more complaints for me. That for sure is protected activity. Shokri didn't just sit there. He called him out on it. That is protected activity. But if you even forget... So I thought you had a good point that the January conversation where he said, I think you're discriminating against me is protected activity. But do you have a case that says that that October conversation would be protected activity? We cited two cases that talk about when you have a confrontation between when an employee, like, where are you from? What is your nationality in context? The only interpretation we have here is Mr. Shokri's. And that would be racial. Just like you could say, you know, she's got a nice rack. You could be talking about the spice rack. But it's the context of how Mr. Shokri basically discusses the issue. And I think that's protected activity. But what I want to remind the Court is that even if we started on January 5th and looked at... He should not have been subject to the RIF. The RIF is 60%. Mr. Shokri would not have been in the RIF had Mr. Garrity not manipulated the scores with Marcy McEwen. Moreover, if you look at the assessment rating, which is ER-419, he didn't even comply with the policies. Plus, they violate the... For example, you need to have input in the RIF competency. And if you look at Tim Nelson's... Okay, you're way over your time at this point. Okay, but I'm just saying there's plenty of the evidence here, Your Honor, that supports this is a powerful case. And I haven't seen anything like it in the Ninth Circuit where a summary judgment was upheld with these kind of facts. Thank you, counsel. Thank you both sides for the helpful arguments. The case is submitted and we're adjourned for the day.
judges: Kleinfeld, Friedland, Ezra